JUDGE SCHOFIELD

15 CV 1377

**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, New York 10178
(212) 309-6000
Attorneys for Plaintiffs ErGo Media Capital, LLC,
Cee Gee Cee, LLC and Erik H. Gordon

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ERGO MEDIA CAPITAL, LLC, CEE GEE CEE, LLC and ERIK H. GORDON,<br><br>    Plaintiffs,<br><br>v.<br><br>LOTTI BLUEMNER,<br><br>    Defendant. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs ErGo Media Capital, LLC ("ErGo"), Cee Gee Cee, LLC ("CGC") and Erik H. Gordon ("Gordon") (collectively, "Plaintiffs"), by and through their attorneys Morgan, Lewis & Bockius LLP, allege the following for their complaint against Lotti Bluemner ("Defendant"):

## NATURE OF ACTION

1.  Defendant is a former employee of Plaintiff Erik Gordon.

2.  This action arises from an extensive and ongoing course of wrongful conduct by Defendant, who, among other things, has defamed Gordon, to his considerable detriment.

3.  Defendant has made written false statements of purported fact regarding Gordon, including statements regarding Gordon's character, moral propensity, legal conduct, and political associations, which are untrue and which have damaged and continue to damage Gordon's reputation and current and/or prospective business relationships and opportunities.

4.  Gordon asserts claims against Defendant for defamation.

-2-

5. Defendant's actions have caused and, unless enjoined by this Court, will continue to cause, immediate and irreparable injury to Gordon, as well as to Gordon's business relationships.

6. Gordon also asserts claims against Defendant for tortious interference with current and prospective business relations, breach of contractual non-disclosure obligations, conversion and breach of loyalty.

7. In addition, Defendant has taken unlawful possession of, and refused to return, Gordon and ErGo's property, including through fraudulent means.

8. ErGo and Gordon bring this action seeking injunctive relief and damages arising out of Defendant's breaches of her contractual and other obligations to Gordon and her various tortious acts.

9. In addition, Defendant hampered business relationships between CGC and a potential client.

10. CGC asserts claims against Defendant for tortious interference with current and prospective business relations.

## THE PARTIES

11. Gordon is a resident of Florida, who does business in New York.

12. ErGo is a Delaware limited liability company doing business in New York.

13. CGC is a Delaware limited liability company doing business in New York.

14. Upon information and belief, Defendant is a resident of California. From approximately April 2012 through July 11, 2013, Defendant was employed by Gordon and was paid from Ergo's New York bank account.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as, upon information and belief, there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     Plaintiffs transact a substantial part of business in this District and the conduct complained of occurred in this District.

17.     During Defendant's employment, she was paid by direct deposit from New York through a bank account located in New York. Defendant was in regular communication by email and by phone with coworkers in New York to whom she was required to send reports and other information about the projects to which she was assigned.

18.     The Confidentiality and Non-Disclosure Agreement ("Non-Disclosure Agreement") entered into by and between Defendant and Gordon (collectively, "Parties") through which the Parties expressly agreed, and waived any objection, to venue being appropriate in the United States District Court for the Southern District of New York.

19.     Venue is proper in this Court to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims, as well as the damage to Gordon's reputation, occurred in this District.

20.     This Court has personal jurisdiction over Defendant because of the contractual provision set forth in Paragraph 19 above.

## FACTUAL BACKGROUND

### Defendant's Employment

21.     In April 2012, Gordon hired Defendant as a personal assistant.

22.     In her role, Defendant was responsible for maintaining and overseeing the upkeep of 132 South Maple Drive, Penthouse # 4, Beverly Hills, California 90212. Defendant was also responsible for various other duties of a personal assistant, including, but not limited to, arranging travel and accommodations; meeting and greeting visitors; organizing events; and liaising with other staff.

23.     In her role, Defendant was exposed and had access to confidential information regarding Gordon's business dealings and personal relationships.

24.     Defendant was also entrusted with conducting a search, and compiling a "short-list," of real estate properties which Gordon would consider purchasing.

25.     Upon information and belief, Defendant requested kick-backs from the real estate agents with whom she negotiated on Gordon's behalf. Such requests placed Gordon's reputation at risk with those real estate agents, as, upon information and belief, they became wary of partnering with Gordon in light of Defendant's demands. Gordon also missed out on certain real estate purchase opportunities, because Defendant failed to show him properties listed by agents with whom she did not have a "kick-back" agreement.

26.     Throughout her employment, Defendant was provided access to and had use of one of Gordon's credit cards for performing her job duties and responsibilities. Defendant used the credit card to purchase personal items from the Apple store, totaling $1,229.51, without Gordon's permission or authorization. Upon information and belief, Defendant has also used the credit card to pay for other personal items, without Gordon's permission or authorization.

27.     Defendant was also provided access to a Cadillac Escalade luxury SUV. Upon information and belief, Defendant allowed an unauthorized individual to drive the automobile,

thereby adding over 1,000 miles to the vehicle's odometer and also used the vehicle herself. The additional mileage resulted in the diminution of the car's value.

28.     In addition, CGC had the Escalade listed for sale prior to the additional mileage being added to the odometer. However, upon discovering the additional mileage, a prospective buyer rescinded his offer.

## The Terms and Conditions of The Parties' Non-Disclosure Agreement

29.     Defendant entered into the Non-Disclosure Agreement with Gordon on or about May 30, 2010.

30.     The Non-Disclosure Agreement contains protections and rules governing Confidential Information.

31.     In signing the Non-Disclosure Agreement, Defendant expressly affirmed in writing that she acknowledged and agreed:

> a. To treat any and all information (whether written or oral or electronic) concerning Gordon that is furnished (whether before or after the date of the Non-Disclosure Agreement) to her by or on behalf of Gordon (the "Confidential Information") in accordance with the provisions of the Non-Disclosure Agreement;
>
> b. Not to disclose any of the Confidential Information to any person or entity in any manner whatsoever;
>
> c. Not to use the Confidential Information, directly or indirectly, in any way that is detrimental to Gordon;
>
> d. In the event that Defendant is requested or required to disclose any of the Confidential Information, Defendant shall (i) provide Gordon with notice of the existence, terms and circumstances surrounding any such request or requirement as soon as practicable and, at Gordon's request and expense, seek or help Gordon seek a protective order or other appropriate assurance that confidential treatment will be accorded to such portions of the disclosed Confidential Information which Gordon so designates, (ii) consult with Gordon on the advisability of taking legally available steps to resist or narrow such requirements, (iii) disclose only that portion of the Confidential Information which Defendant is advised by its counsel is legally required, and (iv) prior to disclosing such material, request that confidential treatment be accorded such information.

32. Defendant's contractual obligations to Gordon continued beyond her employment with Gordon.

### Defendant's Employment is Terminated

33. On July 11, 2013, Defendant was informed that she was being terminated for poor performance and misconduct.

34. Defendant admitted that she had allowed the Escalade, owned by CGC, to be used without Gordon's permission, apologized for her misconduct and asked Gordon to reinstate her as his personal assistant. In an effort to regain her position, in an unprompted e-mail, Defendant offered to "work for 50% of the pay" and to "look wicked hot" when attending "events and parties."

35. Following her termination, Defendant failed to return a computer system, including but not limited to an Apple laptop, docking equipment, monitor, printer, software, and all related peripherals, cables, manuals and packaging, to ErGo.

36. Upon realizing that she would not be reinstated, Defendant filed a complaint in California state court ("California Complaint") on February 28, 2014, alleging discrimination, harassment and wrongful termination.

37. The California Complaint contains numerous false, malicious and defamatory statements about Gordon, which are in no way relevant to, or made in furtherance of, the Defendant's claims in her California Complaint.

38. The following malicious and untrue statements appear in the publicly filed complaint:

39. "On or about May 26, 2012, Gordon and his guests procured various narcotics and professional strippers at his hotel room."

40. "Gordon's *modus operandi*, consisted of trading upon his father's (one of the founders of Angelo & Gordon) wealth, fame, connections, and political capital by taking meetings during the day with his and his father's wealthy and politically connected friends, celebrities, and politicians, and then partying, drinking, and consuming various illegal drugs each night, including, but not limited to, 'ecstasy' (MDMA); cocaine; marijuana; 'Molly' (MDMA); and 'special k' (Ketamine), prescription drugs such as oxycotin, and others, as well as regularly engaging strippers and prostitutes."

41. "[Defendant] essentially 'baby-sat' Gordon, who became so intoxicated at times during the nights and days of partying that he became susceptible to thievery and/or injury, monetarily or otherwise, by various unscrupulous persons and hangers-on who attempted to take advantage of Gordon's wealth while he was in an intoxicated, inebriated, and vulnerable state."

42. These statements are untrue and known by Defendant to be untrue.

43. Defendant filed the California Complaint in an effort to harass Gordon.

44. The false statements made by Defendant were not privileged in any way, as they are irrelevant to the allegations in her California Complaint and made with reckless disregard as to their truth or accuracy.

45. Upon information and belief, as a result of Defendant's false statements, many individuals have become aware of Defendant's unfounded accusations against Gordon, subjecting him to ill-repute and sabotaging his reputation, legitimate, lawful business ventures and personal relationships.

46. Gordon has suffered and continues to suffer as a result of Defendant's false statements.

47. Because Gordon is likely to successfully demonstrate the false and injurious nature of Defendant's statements, and because such statements have harmed, and continue to harm

Gordon's professional achievements and personal reputation, Gordon respectfully requests that this Court enjoin Defendant from making further statements against him, and award him monetary relief for the damage Defendant has caused.

48. Defendant also breached the confidentiality obligations of the Non-Disclosure Agreement when she included irrelevant personal information regarding Gordon's personal relationships and travel destinations in her California Complaint.

49. Defendant published the following irrelevant statements, which constitute confidential information covered by the Non-Disclosure Agreement.

50. "In or about late May, 2013 or early June, 2013, Gordon began pursuing a new girl, Malea. At Gordon's direction, [Defendant] took her on several multi-thousand dollar shopping sprees, as well as made Gordon's Beverly Hills residence and vehicles available to her whenever she requested the same."

51. "On or about June, 2013, Gordon, Malea, and others, departed for Ibiza where they remained until their return on or about July, 2013. Prior to their departure, Gordon and Malea informed [Defendant] that upon their return, Malea would be moving into Gordon's residence in Beverly Hills, California."

52. Defendant failed to keep the above information confidential, as required by the Non-Disclosure Agreement.

53. Moreover, Defendant failed to inform Gordon that she would be disclosing this information, and failed to take any action at all to keep such information confidential.

54. Through these and other actions and disclosures Defendant has breached her obligations under the Non-Disclosure Agreement.

## COUNT I
### (Breach of Contract)

55. Plaintiffs incorporate by reference each of the foregoing paragraphs of their Complaint as if the same were set forth fully herein.

56. At all relevant times, Defendant was bound by the terms of the Parties' Non-Disclosure Agreement. Those obligations prevent Defendant from disclosing any Confidential Information to any person or entity.

57. Despite these obligations, upon information and belief, Defendant misappropriated and published such information, in violation and breach of, among other things, the terms of the Parties' Non-Disclosure Agreement.

58. As a direct and proximate result of Defendant's breaches of the Parties' Non-Disclosure Agreement, Gordon is at risk of losing valuable personal relationships, and has suffered irreparable harm and unquantifiable losses.

59. Gordon has been damaged and continues to be damaged as a result of Defendant's actions and is therefore entitled to damages, including compensatory damages, in an amount to be determined at trial.

## COUNT II
### (Breach of Duty of Loyalty)

60. Plaintiffs incorporate by reference each of the foregoing paragraphs of their Complaint as if the same were set forth fully herein.

61. Defendant owed Gordon a duty of loyalty not to take any actions contrary to Gordon's best interests while still in his employ.

62. Had Defendant informed Gordon of her efforts to show him only properties listed by real estate agents who promised to pay her a "kick-back," Gordon would not have continued to pay Defendant a salary. Defendant intentionally failed to disclose this information to Gordon.

63. Defendant breached her duty of loyalty to Gordon by taking actions contrary to Gordon's interest while she was employed.

64. Defendant was faithless in the performance of her services to Gordon, and was thus a "faithless servant" when she, unbeknownst to Gordon, and without Gordon's consent, engaged in the activity described above.

65. Defendant's acts were committed in deliberate disregard of the known rights of Gordon.

66. As a direct and proximate result of Defendant's actions, Gordon has lost valuable real estate opportunities, had his reputation tarnished, and has suffered irreparable harm and unquantifiable business losses.

67. Gordon has been damaged and continues to be damaged as a result of Defendant's actions and is therefore entitled to damages, including compensatory damages, in an amount to be determined at trial.

68. As Defendant breached her duty of loyalty, she is disentitled to her compensation during the period of her disloyalty pursuant to the Faithless Servant doctrine.

69. Defendant's wrongful actions were done in disregard of the duty of loyalty owed by her. Accordingly, an award of punitive damages is also warranted and would serve to deter her and others from engaging in such conduct.

## COUNT III

**(Tortious Interference with Contractual Relations and/or Tortious Interference with Existing and/or Prospective Business Relations)**

70. Plaintiffs incorporate by reference each of the foregoing paragraphs of their Complaint as if the same were set forth fully herein.

71. At all relevant times, CGC had a written and/or oral contract and/or existing or prospective business relationship with a potential buyer for its Cadillac Escalade.

72. By misusing and allowing other individuals access to the Cadillac Escalade for her own personal gain, Defendant knowingly, intentionally, wrongfully and tortiously interfered with CGC's contractual and/or existing and/or prospective business relationship with the intended buyer by her actions that caused the intended buyer to refuse to finalize the transaction upon learning of the car's additional mileage.

73. By misusing and allowing other individuals access to the Cadillac Escalade for her own personal gain, Defendant carelessly, recklessly and tortiously interfered with CGC's contractual and/or business relationship with an intended buyer and CGC's prospective economic advantage in connection with its relationship with the intended buyer.

74. As a result of these actions, Gordon has been damaged and is entitled to recover damages in an amount to be determined at the trial of this matter.

## COUNT IV
**(Conversion)**

75. Plaintiffs incorporate by reference each of the foregoing paragraphs of their Complaint as if the same were set forth fully herein.

76. At all relevant times, CGC was in rightful and peaceable possession of a Cadillac Escalade.

77. By misusing and allowing other individuals access to the Cadillac Escalade for her own personal gain, Defendant has misappropriated CGC's property to the detriment, and in violation, of CGC's right to exclusive possession of such property.

78. CGC has lost proceeds from the proposed sale of the automobile, as the intended buyer refused to finalize the transaction upon learning of the car's additional mileage. CGC has yet to locate another buyer for the vehicle.

79. Defendant also had access to Gordon's credit card, which was to be used for performing her job duties and responsibilities. Defendant used the credit card to purchase personal items from the Apple store, totaling $1,229.51, without Gordon's permission or authorization.

80. Due to the actions of Defendant in misappropriating and converting funds from Gordon's possession, Gordon became obligated to pay for the purchases with his own funds.

81. At all relevant times, ErGo was in rightful and peaceable possession of a computer system, including but not limited to an Apple laptop, docking equipment, monitor, printer, software, and all related peripherals, cables, manuals and packaging.

82. Despite a clear written request to do so Defendant has failed to return this computer system, including but not limited to an Apple laptop, docking equipment, monitor, printer, software, and all related peripherals, cables, manuals and packaging, to ErGo.

83. The foregoing constitutes unlawful conversion of Plaintiffs' property.

84. As a direct and proximate result of Defendant's actions, Plaintiffs have been and continue to be damaged and are therefore entitled to damages in an amount to be determined at trial.

## COUNT V
### (Defamation)

85. Plaintiffs incorporate by reference each of the foregoing paragraphs of their Complaint as if the same were set forth fully herein.

86. Defendant published or caused to be published the defamatory California Complaint, which falsely accused Gordon of illegal and/or unprescribed drug use, public intoxication, procurement of strippers and prostitutes, nights of "drunken and drug-fueled debauchery," and unwanted sexual advances, among other statements.

87. Gordon is not a public figure.

88. Defendant's statements are defamatory *per se* because they injure Gordon's professional name and reputation by stating or implying that he is deceitful, unethical, and without integrity, and by falsely portraying Gordon as guilty of violations of the law.

89. Defendant published the false and defamatory statements with actual malice because she either knew the statements were false or published them with a reckless disregard for their truth or falsity. At a minimum, Defendant acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

90. Defendant was motivated by hatred, personal spite, and/or ill will towards Gordon, and Defendant maliciously published the statements with intent to harm Gordon.

91. In making these statements, Defendant was not protected by any privilege, whether qualified or absolute. Indeed, these statements were not simply opinions, but rather empirically verifiable statements of fact.

92. As a result of the defamatory statements described above, Gordon has suffered (and continues to suffer) damages, including injury to his name, degradation of his reputation in his business and trade, and financial interests.

93. The statements were published to a third party outlet without privilege or Gordon's authorization.

94. The statements were made intentionally and with malice, ill-will, personal spite, and/or reckless or negligent disregard for the truth or falsity of the statements.

95. As a result of Defendant's defamation of Gordon, Gordon has been damaged and is entitled to recover monetary damages, punitive damages and special damages in an amount to be determined at the trial of this matter.

## COUNT VI
### (Intentional Infliction of Emotional Distress)

96. Plaintiffs incorporate by reference each of the foregoing paragraphs of their Complaint as if the same were set forth fully herein.

97. In publishing the defamatory statements in her California Complaint disparaging and demeaning Gordon, Defendant engaged in conduct towards Gordon that was so extreme and outrageous so as to exceed the bounds of decency in a civilized society.

98. By her actions and conduct, Defendant intended to and did intentionally cause, or acted with reckless disregard of the substantial probability of causing, Gordon to suffer severe emotional distress.

99. As a direct and proximate result of Defendant's conduct, Gordon has suffered, and continues to suffer, severe emotional distress, for which he is entitled to an award of damages to be determined at trial.

100. Defendant's extreme and outrageous conduct was knowing, malicious, willful and wanton, entitling Gordon to an award of punitive damages.

-15-

## DEMAND FOR TRIAL BY JURY

Plaintiffs request that a jury trial be held in this matter as to all claims asserted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully seek an order:

a. Preliminarily and permanently enjoining and restraining Defendant from, directly or indirectly, using, publicizing or disclosing any of Gordon's Confidential Information;

b. Awarding Plaintiffs damages, including compensatory damages in an amount to be determined at trial on Counts I through V;

c. Awarding Plaintiffs punitive damages in an amount to be determined at trial on Counts II, III, V and VI;

d. Directing Defendant to reimburse Gordon for all compensation earned following her breach of her duty of loyalty;

e. Awarding Plaintiffs reasonable attorneys' fees and costs incurred in connection with this action;

f. Awarding Plaintiffs pre- and post-judgment interest; and

g. Awarding Plaintiffs such other relief as the Court deems just and proper.

-16-

Dated: February 25, 2015

MORGAN LEWIS & BOCKIUS LLP

By: _____
Christopher A. Parlo
Andriette A. Roberts

101 Park Avenue
New York, NY 10178

Telephone: 212.309.6000
Facsimile: 212.309.6001

*Attorneys for Plaintiffs ErGo Media Capital, LLC, Cee Gee Cee, LLC and Erik H. Gordon*

DB1/ 82431294.2